WALTER M. ELSWICK, Judge.
*115 This case was heard by the court at a special term held at Wheeling, West Virginia, on the 25th day of February 1942. It appears from the evidence that on October 27, 1936, the claimant, George B. Cecil, was employed as a day laborer by the state road commission at a stone quarry on Riley hill, above Middle Grave creek, in Marshall county, West Virginia. On the morning of said day claimant had been transported from Moundsville to the stone quarry in the cab of a state road truck operated by a state road employee. In the evening, about four-thirty o’clock, when their day’s work was complete, another state road truck drove up to where claimant and a companion were standing and stopped for the purpose of offering to furnish claimant and his companion transportation back to Moundsville. Claimant testified that when the truck stopped, his companion, Robert Darrow, entered the bed of the truck, but at which time claimant failed to enter same. After the truck had been driven ten to fifteen feet further down the hill and again stopped, claimant entered the bed of the truck. The driver of the truck, Burson Davis, testified that on the evening in question he had two companions in the cab of the truck with him, and that upon arriving at the place where Mr. Cecil and his companion were standing, he stopped. He testified that he thought they motioned for him to go ahead and he continued to drive on not knowing that the two men had entered the back end of his truck until one of the companions in the cab announced that the accident complained of had occurred. Robert Darrow, claimant’s companion, was in the United States Army on the day of the hearing and was not produced as a witness. Neither were the truck driver’s two companions in the cab produced as witnesses. From the evidence it appears that the driver drove the truck down the road from Riley hill toward Middle Grave creek at a modeate rate of speed until he left the hill and then upon a straightaway he picked up speed from twenty-five to thirty miles per hour. Claimant testified that the truck bed did not have any seat, and contained mud and water which did not permit him and his companion to sit down. They stood up leaning on to the cab of the truck until it came to a feharp curve turning first to right then to the left. When the truck *116 made the turn to the right claimant by the swing of the truck was thrown against his companion standing on his left, and as the truck swung'to the left claimant was thrown out of the truck backwards, falling into the roadway and was thereby injured, for which he claims compensation. Claimant was not acquainted with the road, and it appears from the evidence that the driver did not slow down his speed when approaching the curve in question. It appears from the evidence that a reasonable and safe rate of speed around this curve would have been from ten to fifteen miles per hour while the driver Was exceeding that rate of speed. After the injury claimant was taken by the road employees to Dr. S. F. Yoho of Moundsville, West Virginia, who rendered him first aid, and then sent him to Reynolds memorial hospital at Glendale, West Virginia. He had received a laceration at the back of his head and a fractured vertebra. Claimant was x-rayed on October 28, 1936, by Dr. Haislip of said hospital. From the x-ray it appeared that claimant had received a fracture of the first lumbar vertebra and lower dorsal, (record p. 6). Other x-ray pictures were taken on November 16, 1936 and on December 6, 1936. The latter radiographs of the lumbar and lower dorsal spine showed a compression fracture of the first lumbar vertebra body in good position and alignment and showing healing. The ninth thoracic spine also showed a compression fracture, and good position and alignment. Dr. Haislip by profession a roentgenologist and radiologist with wide experience in treatment of such injuries (record p. 13) testified that persons sustaining fractures such as the one which claimant received usually have some limitation of motion in their spines, and while some do continue working, others don’t. “It just depends on how badly they can stand the pain and how badly they need the work and various other factors” (record p. 15). It also appears from his evidence that the injury received is “a permanent compression of the bodies and when they are mashed down, unless you can get them right out right away, they stay mashed down”; that it would interfere, so far as the full proper function of it is concerned and would cause pain frequently or most of the time throughout life (record p. 17). Dr. Haislip further testified in his opinion *117 claimant would have some pain, but as to how much, “it’s more likely a personal item.” It also appears from the testimony of said physicians that the age of the person injured would be a factor considered, the older the person is the longer the period of recovery.
The claimant remained at the hospital for a period of seven weeks, and during the first week was unconscious or delirious. At the end of seven weeks he was removed to his home where he received further treatment by Dr. Yoho during the year 1937.
He was carried on the payroll of the state road commission until the 15th day of April 1937, receiving approximately $160.00 as wages during all of which time he was unable "to work. It would appear that he was then dropped from the payroll and still remained unable to work. However, he was permitted to perform some light work for the road commission for a short time in 1938.
Before sustaining the injuries complained of it appears that the claimant was an able-bodied man and a good worker. He had worked on farms most of his life, but had also worked as a teamster several years receiving wages from one dollar to six dollars per day. At the time of the injury he was "employed at a stone quarry receiving $3.20 per day. He was then approximately fifty-one years of age, married and the father of four children, and is the father of another child bom since said time. The children’s ages now range from two to eighteen years. Since the injury claimant has been unable to perform the labors which he had been accustomed to do. He can only perform light work today and such work is likely to be accompanied by pain. This view is substantiated by his testimony, his wife, and the physicians attending him following the injury heretofore referred to.
There was an appropriation made by the Legislature, under the general appropriation act of 1937, to George Cecile, who is the same person as claimant, for the sum of $304.18. From *118 the record it appears that said sum was applied as follows: To Reynolds memorial hospital for hospitalization of claimant $157.50; to Dr. S.-F. Yoho for medical services rendered claimant $55.00; and to claimant was paid the sum of $91.68 in the year 1937 as appears by receipt signed by claimant filed in evidence as “exhibit b.”
There was another appropriation made by the Legislature, under the general appropriation act of 1939 to claimant, as George Cecile, for the sum of $332.59, which amount was receipted by him on' April 19, 1939, but from which sum the wages he had drawn from date of injury until April 15, 1937 were deducted when the check was endorsed and delivered for payment. From these two appropriations it appears that a total of $636.77 has been paid to and on behalf of claimant on account of said injury.
The state road commission, by the attorney general, filed a general denial of liability on the claim and a special plea of release. It appears that both receipts signed by claimant, namely, the one for $91.68 in 1937 and the one for $332.59 in. 1939, contain the words “in full settlement.” The receipt taken under the 1937 appropriation calls for “Claim No. 128” while the receipt for the 1939 appropriation calls for “Claim No. 53.” The latter receipt contains a sentence which reads “The state road commission is hereby released from further liability in connection with above numbered claim.”
Claimant testified that he didn’t file a claim with the road commission or Legislature and didn’t have any knowledge ot any claim being before the Legislature until sometime in June 1937 he received a notice by mail to come to Moundsville to endorse a check that had come to pay his doctor and hospital bills, that being a notice of the arrival of the check for $304.18 included in the general appropriation act of 1937, (record pp. 32 and 33). He says that he was not consulted about his claim, had no conversation with any of the state road officials, and *119 had no representative to present his claim before either the state road commission or the Legislature and the road commission was unable to show how the claims were presented, by whom, or that Cecil, the claimant, knew the same were before the Legislative Committees. (Record p. 108). The next notice the claimant had was by a note handed to him in 1939 by a neighbor boy asking him to come into the road shed at Moundsville to get the balance of his compensation, this being notice of the arrival of a check for the $332.59 included in the general appropriation act of 1939. He testifies that he knew nothing about the matter having been before the Legislature. (Record p. 29). On the following day, June 19th, he went to the office of the road commission at Moundsville and conferred with Mr. J. N. Ryles, the then maintenance superintendent of Marshall county. He testifies that the check for $332.59 was presented to him, with request that he endorse it and sign a receipt for the full amount to be sent back to the state road commission, but to permit the maintenance superintendent to deduct from the amount of the check the amount of wages the claimant had received from the date of his injury to the 15th day of April 1936, which was done, and it appears that the amount so deducted was forwarded by the maintenance superintendent to the state road commission (record pp. 29 and 106). Claimant testifies that he could not read print without his glasses and that he did not have his glasses with him. He says that he asked what the paper was and was told “That it was nothing but a receipt to be sent back to the state road commission to show that you received your money off of the payroll — your balance.” (Record p. 30). Claimant testifies that he could not read the receipt or release and that it was not read to him when he signed it, but relied upon what he was told, as above stated, it represented. Mr. Pyles, the maintenance superintendent, testified that he read the receipt or release over to the claimant when he signed it. He says that “Mr. Cecil, if I recall, asked me to read it over to him, which I did at that time.” (Record p. 109). It doesn’t appear that he had any specific instructions concerning the delivery of the check except to see that the deduction was made for Wages paid Cecil during his confinement from the injury. He did not *120 know at whose suggestion Cecil had come to the office, but says that Cecil told him he had received a notice to come to the office. (Record p. 105). Such matters were usually handled through the district engineer’s office, and the matter pertaining to the delivery of this check was the only connection which he had concerning the Cecil case. (Record pp. 107 and 110). It appears that two men by the names of John Jefferson and George Kelly were in the office when the check was endorsed and the release signed. (Record pp. 29 and 77). John Jefferson, who was foreman on the job when Cecil was injured, testified that he didn’t remember whether the release was read to Cecil. (Record p. 76). Kelly was not produced as a witness.
The Appropriations made to Cecil by the Legislatures of 1937 and 1939 were not founded upon a bill showing a recital of facts or other memorandum indicating that the Legislatures had knowledge of the details concerning the nature of claimant’s injuries or the factors concerning their cause. There is nothing to indicate from these appropriations that either was made in contemplation of a full release and discharge of liabilities for his injuries. Cecil’s claim was not a contractual one, but in the nature of an unliquidated tort, and the road commission could not have settled his claim without the approval of the Legislature and from funds designated by it. The Legislature did not direct a form of release as settlement and it does not appear that claimant was consulted about the claims or had knowledge of any intention on the part of the Legislatures to make a final award of compensation to him, nor does it appear that the road commission at any time sought to obtain his consent to a final award for approval by the Legislature.
Furthermore, it doesn’t appear that claimant contemplated or intended to release his claim in full. For within thirty days from the date he received the check authorized by the 1939 appropriation he came to the office of the road district engineer to file his claim for compensation. He was instructed by the road engineer to present it in writing and later, on May 19, 1939, he by letter addressed to the road engineer set forth his claim for compensation which letter was filed as state’s “ex- *121 ‘bibit No. 1.” A reply was made to this letter on May 24, 1939 without reference to any release signed by claimant, but requesting claimant to call at the office again for a personal discussion relative to making recommendation on the claim to the Charleston office. Pursuant to said request the claimant met with the district engineer and was requested to have a physical examination made by three physicians. He conferred with Dr. Yoho and Dr. Ashworth at Moundsville and was advised to go to Dr. Wiler at Wheeling for an x-ray. When he went to Dr. Wiler he learned that he could not secure an x-ray without a permit from the state road commission, or by payment of the fee of $15.00 which he says he did not have. He didn’t pursue the course of securing examinations further. Near the beginning of the hearing the state, by its attorney general, made a request for á physical examination of claimant, but the request was withdrawn near the conclusion of the hearing. (Record pp. 54 and 114).
We are of the opinion from the evidence that the amounts paid to claimant and on his behalf are not adequate compensation for his injuries; that the road commission employees were negligent in the maimer of his transportation at the time of the injury, and that it was its custom and practice to transport its employees to and from their work; that there was not a meeting of the minds of the claimant and officials of the road commission as to any full and final settlement being made to him for the compensation which he was entitled to receive. We are of the opinion, from the evidence, that claimant is entitled to an additional award of nine hundred dollars ($900.00), aiid an order will be entered accordingly.
Under the procedure prescribed for the court of claims, we trust that the complications relative to consultation of departments with claimant as well as the question of the purpose and intention of appropriations involved in this case, can be avoided, when awards upon a full hearing, or consent agreements under the shortened procedure, are recommended.